Frances BINGAMAN, Mrs. L. T. Cook, Thomas G. Smith, E. S. Hester and George Bingaman, Plaintiffs in Error,

v.

CORPORATION COMMISSION of the State of Oklahoma and Sunray DX Oil Company, a Corporation, Defendants in Error.

No. 41433.

Supreme Court of Oklahoma.

June 21, 1966.

Rehearing Denied Sept. 20, 1966.

Second Petition for Rehearing Denied Dec. 27, 1966.

George Bingaman, Purcell, for plaintiffs in error.

Ferrill Rogers, Conservation Atty., Nell Rhodes Fisher, Asst. Conservation Atty., Oklahoma City, for defendant in error, Corporation Commission of Oklahoma.

T. Murray Robinson, Oklahoma City, M. Darwin Kirk, J. P. Greve, William R. Loar, John F. Curran, Tulsa, for defendant in error, Sunray DX Oil Co.

IRWIN, Justice.

This is an appeal from a final order entered by the Corporation Commission which created the Criner Bromide Sand Unit in McClain County, and approved a Plan of Unitization for secondary recovery operations by the injection of either gas or liquid hydrocarbons. The plaintiffs in error are non-consenting royalty owners in the Unit and will be designated as Protestants. The Corporation Commission will be referred to as Commission.

Protestants are not opposed to the creation of the Unit or the designated allocation of production to the respective tracts; but challenge the order on the grounds that it permits the operator to invade the ⅛th royalty reserved to the lessors and permits the payment of part of the expenses of the operation from the ⅛th royalty.

## FACTS

The record discloses a tremendous amount of water underlies the formation and the injection of gas or liquid hydrocarbons is the most feasible plan for secondary recovery operations. The reservoir is composed of gas and oil in solution and the wet gas is separated from the oil at the surface. As the gas or the liquid hydrocarbons is injected into the reservoir they will "soak up" hydrocarbons and the gas produced will be wet gas until such time as the reservoir has been depleted of its hydrocarbons. Hydrocarbons are extracted from the wet gas at a nearby plant and the dry gas is reinjected into the reservoir and the hydrocarbons sold as production.

Under the order, the operator is authorized to purchase natural gases and liquid hydrocarbons, as distinguished from natural gases, from outside the unit area for injection. The outside natural gas and gas produced from the premises will not be produced for sale but used for injection purposes until the secondary recovery program has been completed which is estimated to be approximately 20 to 25 years.

The section of the Plan of Unitization which protestants contend invades the rights of the royalty owners, will be set forth as paragraphs (a) and (b) for clarification, and is as follows:

(a) "If any Outside Substances consisting of natural gases are injected into the Unitized Formation, fifty percent (50%) of any like substances contained in Unitized Substances subsequently produced and sold, or used for other than operations hereunder, shall be deemed to be Oustide Substances until the aggregate of said fifty percent (50%) equals the accumulated volume of such natural gases injected into the Unitized Formation, and no payments shall be due or payable to Royalty Owners on said fifty percent (50%).

(b) "If the Outside Substances injected be liquified petroleum gases or other liquid hydrocarbons, as distinguished from natural gases prior to injection, the Lessees shall have the right, beginning one (1) year after the injection of such liquified petroleum gases or other liquid hydrocarbons is commenced, to recover all such liquified petroleum gases or other hydrocarbons without payment of royalty. In order to provide a reasonable and practical basis of accounting for the same, it is understood and agreed that ten percent (10%) of the entire production produced and sold from the Unitized Formation shall be deemed to be Outside Substances until the aggregate value of said ten percent (10%) of said production equals the entire accumulated cost to the Lessees of such Outside Substances."

## CONCLUSIONS

■ The record does not disclose the terms of protestants' oil and gas lease, but Commission, in effect, states that such lease contains the customary provision that the lessee shall have the right to use, free of cost, gas found on the premises for its operations on the leased premises. Protestants do not argue that their lease does not contain such provision. Therefore, it could not be seriously argued that protestants would be entitled to a ⅛th royalty on the gas that was produced from the leased premises and re-injected in the reservoir in the secondary recovery operations.

If protestants would not be entitled to royalty on the gas produced from the leased premises and re-jected in the reservoir, they would not be entitled to a ⅛th royalty on the gas that is purchased outside the unit and injected in the reservoir, processed and re-injected in the reservoir for the secondary recovery program.

■ Stated in another way, when wet gas is produced and the dry gas is separated from the wet gas and re-injected into the reservoir, protestants would not be entitled to royalty on the dry gas when it is re-injected in the reservoir whether such gas is considered gas produced from the

leased premises or dry gas purchased from outside the unit area.

We will now consider the section of the Plan of Unitization which permits the operator to recover the volume of natural gas and/or liquid hydrocarbons purchased from outside the unit and injected into the reservoir.

Under paragraph (a) of the order, when the secondary recovery operations are completed, the operator will receive 50% of the dry gas produced until it receives the same volume of natural gas it purchased from outside the unit and injected into the reservoir. During this time, protestants will receive a $\frac{1}{8}$th royalty on 50% of the dry gas produced. When the aggregate of the 50% of the gas received by the operator equals the accumulated volume of natural gas purchased from outside the unit and injected into the reservoir, protestants will then receive a $\frac{1}{8}$th royalty on all the gas thereafter produced. In other words, the order permits the operator to recover from 50% of the natural gas produced after the secondary recovery operations have been completed, the volume of gas it purchased from outside the unit and injected into the reservoir.

Under paragraph (b) of the Commission's order, if liquid hydrocarbons are purchased from outside the unit and injected into the reservoir, the operator is entitled to recover the cost of such liquid hydrocarbons beginning one year after injection from ten per cent of the liquid hydrocarbons produced. The cost herein referred to is construed as and we hold that such cost is the actual cost of such liquid hydrocarbons in kind exclusive of any and all costs for transportation, operation, and/or maintenance, etc.

In our opinion, if the operator is entitled to recover natural gas it purchased from outside the unit area and injected into the reservoir, there would be no logical reason for denying the operator the right to recover liquid hydrocarbons it purchased outside the unit and injected into the reservoir. In the order, the formula for recovery of the natural gas purchased is on a volume basis, and recovery of the liquid hydrocarbons is on a cost basis and both provide a reasonable and practical basis of accounting.

The record does not sustain protestants' argument that the Plan of Unitization as approved by Commission places the operating expenses of the unit on the protestants and other royalty owners or that they will not receive their proportionate share of the royalty on the liquid hydrocarbons produced.

The plan approved by the Commission provides in part that:

"A one-eighth ($\frac{1}{8}$) part of the Unitized Substances allocated to each Tract shall in all events be regarded as royalty to be distributed to and among, or the proceeds thereof paid to, the basic Royalty Owners free and clear of all Unit Expense and free of any lien."

The record contains casinghead gas contracts which provide that these royalty owners will be compensated for these extracted hydrocarbons. Furthermore, in the Report of the Commission which contains its findings and orders, the Commission's Finding No. 9, in part, states that the plan does not obligate the royalty owners for payment of any portion of the operating expenses or investment of the proposed unit and the normal $\frac{1}{8}$th royalty will be free and clear of all operating and investment costs; that the liquids contained in all produced gas, whether deemed outside substances or indigenous gas will have royalty paid thereon; and that the operator, upon demand, shall make a proper accounting to any interested party.

We can find no evidence nor provision in the Plan of Unitization that places any expenses of the secondary recovery program on protestants and other royalty owners or that they will not receive their proportionate share of the production attributable to the unit. If the law of "capture" were strictly applied without exceptions in every instance in Oklahoma, protestants' argument that they are entitled

to a ⅛th royalty on all the production, without permitting the operator to recover the natural gas and liquid hydrocarbons purchased from outside the unit, might have some merit. However, the law of "capture" is not strictly applied and there are exceptions in Oklahoma for in Gruger v. Phillips Petroleum Co., 192 Okl. 259, 135 P.2d 485, we said:

"The law of capture, under which oil and gas is owned by the one lawfully reducing it to possession, still obtains in Oklahoma, except as it has been or may be regulated or restricted under laws passed in the exercise of the police power, such as the proration and spacing statutes * * *. Those laws do not abrogate the law of capture. They are not self-executing. They simply authorize administrative boards to issue orders that have the effect of regulating or abrogating in a measure the law of capture."

In the instant proceeding, if the Commission was without power or authority to issue an order which had the effect of regulating or abrogating in a measure the law of capture, the royalty owners would be reaping a benefit to the detriment of the operator and such would not be in harmony with Title 52 O.S.1961, Sec. 287.3, which provides that after certain requirements are met, Commission shall make an order creating the unit and providing for the unitization and unitized operation of the common source of supply or portion thereof " * * * upon such terms and conditions, as may be shown by the evidence to be fair, reasonable, equitable and which are necessary or proper to protect, safeguard, and adjust the respective rights and obligations of the several persons affected, including royalty owners, * * * as well as the lessees. * * *."

That portion of Art. 9, Sec. 20, Oklahoma Constitution which provides:

" * * * In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. * * *."

is controlling in the instant proceeding.

Pursuant to the above constitutional provision, we have made our review and have determined that the Commission has regularly pursued its authority and that the findings and conclusions of Commission are sustained by the law and substantial evidence.

Order affirmed.