**ROBERTS RANCH COMPANY,**
**et al., Plaintiffs,**

v.

**EXXON CORPORATION,**
**et al., Defendants.**

**No. Civ–92–861–R.**

United States District Court,
W.D. Oklahoma.

Feb. 4, 1997.

Bradley Dean Brickell, R. Bruce Kerr, Christine R. Fritze, Mahaffey & Gore, Oklahoma City, OK, for plaintiffs.

Stanley L. Cunningham, M. Richard Mullins, John R. Morris, Myrna S. Latham, Reid E. Robison, Gary W. Catron, McAfee & Taft, Oklahoma City, OK, for Exxon Corporation, a New Jersey corporation, defendant.

Mark Banner, William G. Bernhardt, J. Kevin Hayes, Hall Estill Hardwick Gable, Golden & Nelson, Tulsa, OK, for El Paso Natural Gas Company, a Delaware corporation, defendant.

J. Kevin Hayes, Hall Estill Hardwick Gable, Golden & Nelson, Tulsa, OK, for El Paso Natural Gas Company, cross-defendant.

## ORDER

DAVID L. RUSSELL, Chief Judge.

Before the Court are Defendant Exxon Corporation's Motion for Partial Summary Judgment on the Plaintiffs' Original Breach of Fiduciary Duty Claims and New Claims in Plaintiffs' Fifth Amended Complaint; the Plaintiffs' Motion for Partial Summary Judgment; and the Plaintiffs' Motion to Vacate Prior Order.

### I. *Plaintiffs' Second Cause of Action— Failure to Account for Royalties on Sales of Sulfur*

The Plaintiffs seek summary judgment on their Second Cause of Action, which claims that Exxon failed to properly account for and pay revenues from the sale of sulfur produced from the subject wells.[1] The Plaintiffs have offered evidence that from October 1994 through December 1995, Exxon improperly deducted a 5% surcharge from their sulfur royalty payments. The Plaintiffs' expert avers that from October 1994 through December 1995, "[a] charge equal to 5% of sulfur sales was paid to Exxon Chemical by Exxon Corporation." During this time period, Exxon paid all royalty and overriding royalty owners "based on 95% of the amount of revenue received from the sale of sulfur." According to the Plaintiffs' expert, "[t]he amount due to the royalty and overriding royalty owners for the 5% charge deducted from the price paid for sulfur totals $1,098.93 for the period October, 1994 through December, 1995." (See Affidavit of Cynthia B. Heymans, September 30, 1996, pp. 3–4).

In its response brief, Exxon admits that it initially deducted the 5% surcharge from sulfur royalties for the period October 1994 though January 1996,[2] but Exxon's accountant claims the amount so deducted was only $1,000.57. Exxon's accountant further contends that Exxon has now made an "adjustment" to the Plaintiffs' royalty payments, to fully compensate for this overcharge. According to the Affidavit of LuAnn M. York, senior accounting specialist in the Controller's department of Exxon Company, U.S.A.:

> "The amount due to royalty and overriding royalty owners for the 5% charge deducted from the price paid for the sulfur for the period of October 1994 through January 1996 was $1,000.57. In March and April of 1996, an adjustment was made to compensate the royalty and overriding royalty owners for this amount, which was inadvertently deducted. This error was discovered as a result of an internal accounting review conducted in the ordinary course of business. No additional revenues from the sale of sulfur are due to royalty owners or overriding royalty owners."

Affidavit of LuAnn M. York, October 28, 1996, p. 3.

---

1. The wells which are the subject of this action are identified as the McCall No. 1, the Baker No. 2, the Walne No. 1, the Green No. 1 and the Hazel Howell No. 1, all of which are located in Beckham County, Oklahoma.

2. The Court notes that whereas the Plaintiffs contend the sulfur surcharge was assessed from October 1994 through December 1995, Exxon maintains that the surcharge was assessed from October 1994 through January 1996. Neither the parties' briefs nor their competing affidavits explain this discrepancy.

■ The Court notes that neither accountant has presented calculations showing how the 5% surcharge on sulfur was computed; thus the Court is unable to determine the amount of the surcharge as a matter of law. Moreover, Exxon has offered evidence raising a question as to whether the full amount of the surcharge has now been paid to the Plaintiffs through the alleged "adjustments" in March and April 1996. Because there is a genuine factual dispute as to the amount owing, if any, for these deductions, the Court denies the Plaintiffs' motion for partial summary judgment on this claim.

## II. *Plaintiffs' Third Cause of Action for Breach of Fiduciary Duty*

Exxon seeks summary judgment on the Plaintiffs' Third Cause of Action, which alleges that Exxon has breached its fiduciary duty by entering into various agreements with Leede Exploration, El Paso Natural Gas and their affiliates to settle El Paso's take-or-pay obligations under certain gas purchase contracts.[3] The Court previously held this claim in abeyance pending the ruling of the Supreme Court of Oklahoma in *Roye Realty and Developing, Inc. v. Watson*, 949 P.2d 1208, 1996 WL 515794 (Okla.1996).

In *Roye Realty, supra*, the Supreme Court of Oklahoma held that under Oklahoma law a royalty owner, absent clear language to the contrary in the lease, is not entitled to share in take-or-pay settlements. Since the royalty owner Plaintiffs are not entitled to share in the take-or-pay settlement proceeds, it follows that Exxon's compromise of the take-or-pay claims would not violate any fiduciary duty owed

to the Plaintiffs. Furthermore, the Plaintiffs now "acknowledge that they are not entitled to any damages against Exxon under [their third] cause of action because subsequent discovery has revealed that, while the subject gas contract (No. 8851) was one of the contracts included in a $42 million take-or-pay settlement between El Paso and Exxon, no portion of such settlement was attributed to Contract No. 8851." (Plaintiffs' Response to Exxon's Request for Partial Summary Judgment, p. 4.)[4]

In light of the Plaintiffs' concessions, and in light of the Oklahoma Supreme Court's ruling in *Roye Realty, supra*, the Court finds that Exxon is entitled to partial summary judgment with respect to the Plaintiffs' Third Cause of Action.

## III. *Plaintiffs' Sixth Cause of Action— Royalties On Fuel Consumed in Plant Operations*

Both sides seek summary judgment on the Plaintiffs' claim for payment of royalties on the gas consumed in the operation of the Metano Gas Plant.[5] The Court first notes that the Plaintiffs do not claim that Exxon is required to pay royalties on the gas that has been used on the leased sites for the operation of the wells. (See Second Stipulation, filed January 17, 1997). The Plaintiffs acknowledge that Exxon is entitled to use gas free of cost to operate lifting equipment and other appurtenant machinery on each of the subject well sites. (Plaintiffs' Response to Exxon's Motion for Summary Judgment, p. 5). Thus, the issue presented is whether Exxon is entitled to the uncompensated use of gas to operate the Metano treatment plant.

---

3. Both Leede Exploration and El Paso Natural Gas were formerly defendants in this case.

4. It is not entirely clear what the Plaintiffs mean in that sentence of their Brief. Perhaps they mean that while the subject gas contract, no. 8851, was one of the contracts included in the take-or-pay *dispute* between El Paso and Exxon, no portion of the settlement is attributable to contract no. 8851. In any event, the Plaintiffs' Third Cause of Action is, obviously, no longer in dispute.

5. The Plaintiffs initially suggested that the amount of gas used by Exxon to fuel the Metano treatment plant was excessive. See Plaintiffs' Response to Exxon's Motion for Partial Summary Judgment, pp. 5 – 6; Plaintiffs' Brief in Support of Motion for Partial Summary Judgment, pp. 9 – 10. The Plaintiffs have now stipulated that they "will not challenge the reasonableness of Plant Fuel and Utility Gas volumes." Second Stipulation, filed January 17, 1997.

There are some fifty-five variations in the language of the leases, pooling orders and assignments covering the Plaintiff class members' royalties.[6] Though the various leases and other instruments use different language,[7] most of them include "free use" clauses, expressly allowing Exxon, as lessee, to use gas "for the lessee's operations" on the leased premises free of charge, without payment of royalties. Two of the lease forms contain express no free use clause,[8] and most of the overriding royalty interest conveyances before the Court in this case contain no such clause.[9] However, even in the absence of an express free use clause, it is generally understood that the granting clause of a mineral lease includes, by implication, all rights and privileges that are necessary for the profitable production of such minerals. See, e.g. Kuntz, *The Law of Oil and Gas,* Par. 50.2(c), p. 282, in which the author notes that the so-called "free use" clauses are "probably descriptive of the rights of the lessee that exist in the absence of the clause," and that usually the free use clauses simply serve to remove any doubt on the subject. *See also Holt v. Southwest Antioch Sand Unit,* 292 P.2d 998 (Okla.1955) (lessee has "as incidental

to his ownership the rights and privileges that are necessary for profitable production of such minerals"). Exxon relies on the various "free use" clauses, as well as the implied right to the use of gas.

The Plaintiffs rely on the royalty clauses of their leases, which generally provide for royalty to be paid on gas that is used "off the premises" or used in the manufacture of products. The Plaintiffs maintain that the Metano treatment plant is located "off the premises," stating that the plant is over two miles from the McCall No. 1–29 and Baker 2–28 well sites, and located within the "unit" boundary of the Green No. 1–3 (Plaintiffs' Brief in Support of Motion for Partial Summary Judgment, p. 6). Citing *Franklin v. Wigton,* 132 Okla. 236, 270 P. 1 (1928) and *Vogel v. Cobb,* 193 Okla. 64, 141 P.2d 276 (1943), the Plaintiffs argue that the gas used in the treatment plant bears royalties because it is being used "off the premises."

In *Franklin, supra,* the defendant owned an oil well located on land adjoining the plaintiff's land, and also owned the oil well located on the plaintiff's land. The defendant used gas from the well on the plaintiff's land to pump both wells. Both

---

**6.** See Affidavit of Philip A. Lutes, October 20, 1995, and summaries of the various lease forms attached thereto.

**7.** For example, Lease Forms 01 and 09 provide that: "The lessee shall have the right to use free of costs, gas ... found on said land ... for its operations thereon or on lands unitized therewith including the pressuring, pressure maintenance, cycling and secondary recovery operations." Lease Forms 02, 2A, 08, 8A provide that: "Lessee shall have the right to use, free of cost, gas ... produced on said land for its operations thereon...." Lease Forms 04, 4M and 07 provide: "Lessee shall have the right to use, free of cost, gas ... produced on said land for lessee's operation thereon ..." Lease Form 03 provides that: "Lessee shall have free from royalty or other payment the use of ... gas produced from said land in all operations which Lessee may conduct hereunder ... and the royalty on oil and gas shall be computed after deducting any so used." Lease Forms 05 and 10 provide: "Lessee shall have free use of ... gas ... from said land ... for all operations

hereunder ... and the royalty ... shall be computed after deducting any so used." With regard to the overriding royalty interests, Forms 36, 41, 42 and 43 provide: "Said assigned overriding royalty interest shall be subject to the free fuel to operator provisions ... contained in said leases ... to the same extent as the lessors' royalties are subject to such provisions." See Affidavit of Philip A. Lutes, October 20, 1995, with copies of various lease provisions, Exhibit "C" to Appendix of Exhibits to Defendant Exxon Corporation's Motion for Partial Summary Judgment.

**8.** See Lease Forms 11, 13M.

**9.** Those overriding royalty interests which do contain some reference to the lessee's use of gas simply provide that the interest conveyed is "subject to the free fuel to operator provisions." (See ORRI Forms 41, 42, 43; see also Forms 48, 50, royalty interest deeds which provide that fuel and gas for operating and developing may be deducted before computing the grantor's royalty interests).

wells were pumped at the same time and with the same power. The plaintiffs sued, claiming that the defendant's use of gas constituted a use of gas off the leased premises, for which royalties were owed. The Oklahoma Supreme Court agreed, holding that the defendant's use of gas to run the well on the adjacent tract was a use "off the premises," within the meaning of the annual rental clause that provided for payment of rentals while gas was being used "off the premises." [10]

In *Vogel,* the lease provided that the lessee was entitled to the free use of water produced on the leased land "for its operations thereon." The Supreme Court of Oklahoma held that this clause did not entitle the lessee to use the water to supply houses located off the leased premises, even though the houses were occupied by persons whose duties included operating the lease on the land from which the water was taken. *Vogel,* 141 P.2d at 279.

Exxon cites *Bingaman v. Oklahoma Corporation Commission,* 421 P.2d 635 (Okla.1966), and *Holt v. Southwest Antioch Sand Unit,* 292 P.2d 998 (Okla.1955), arguing that the free use clauses, rather than the royalty clauses, control. In *Bingaman,* the Supreme Court of Oklahoma held that a lease that included what was described as a "customary" free use of gas clause, entitled the lessee to the free use of gas to conduct secondary recovery operations. Similarly, in *Holt, supra,* the Oklahoma court recognized the lessee's right to the free use of salt water for secondary recovery operations.

■ The issue before the Court; i.e., whether a lessee has the right to the free use of gas to operate a treatment plant, either under a free use clause or by implied right, appears to be one of first impression in Oklahoma. It is, however, well established in Oklahoma that in the absence of an express contractual provision to the contrary, the *lessee* bears the costs associated with getting the gas to the place of sale in a marketable form. *Accord, Wood v. TXO Production Corp.,* 854 P.2d

880 (Okla.1992). Ordinarily the lessors' royalty interest is not burdened with post-production treatment costs. *Id.* Furthermore, the Oklahoma cases involving a lessee's use of gas or water have recognized the limited scope of "free use" clauses, while interpreting royalty clauses more broadly. *See Vogel v. Cobb,* 193 Okla. 64, 141 P.2d 276 (1943) (lessee asserting "free use" clause not entitled to free use of water for domestic purposes, as opposed to water used for operation of the well); and *Franklin v. Wigton,* 132 Okla. 236, 270 P. 1 (1928) (gas used to operate an off-site well on adjacent tract was subject to royalties under royalty clause). It is apparent from these cases that the purpose of a free use clause has always been to allow the use of gas as necessary to assist in the production of gas.

■ In this case Exxon is not merely asserting the right to use the gas to assist in the *production* of minerals (which right is uncontested); Exxon asserts the right to use gas to operate its sulfur extraction plant for post-production treatment, which treatments are necessary in order to make the gas marketable. In light of the recent Oklahoma cases defining the lessee's duty to market to include the duty to make the gas marketable, this Court concludes that Oklahoma courts would not allow the various "free use" clauses, or the implied right of free use, to be employed to pass on a substantial portion of the post-production treatment costs to those lessors with market value leases. The Court finds that the Plaintiffs are entitled to partial summary judgment with respect to Exxon's use of gas to operate the Metano treatment plant, and that Exxon's motion for partial summary judgment should be denied with respect to this claim.

## IV. *Exxon's Implementation of Senate Bill 168*

The Plaintiffs seek summary judgment on their claim that Exxon has improperly implemented the royalty distribution and

**10.** *Franklin* did not involve the interpretation or application of an express "free use" clause.

accounting procedures mandated by Oklahoma Senate Bill 168, now codified as the Production Revenue Standards Act at Title 52 Okla.Stat. §§ 570.1, *et seq.* Oklahoma's Production Revenue Standards Act, which became effective July 1993, requires that revenues from the sale of hydrocarbons be distributed to royalty owners according to specified accounting procedures.

The Plaintiffs have offered evidence that Exxon implemented the Act incorrectly for royalties paid on the sale of gas from the effective date of the Act. Instead of dividing each owner's cost-free leases by the total leases for that owner, Exxon divided by the total royalty share for the well. The Plaintiffs contend that by using this procedure, Exxon deducted costs from the revenues contributed by all working interest owners, even those with cost-free leases. The Plaintiffs offer the affidavit of their expert accounting witness Cynthia B. Heymans, who has prepared schedules showing the difference between the revenues paid by Exxon and the royalties which would have been under a proper application of the Production Revenue Standards Act. According to Ms. Heymans' affidavit, the difference between Exxon's payments and the amount due under a correct methodology is an additional $77,017.37.

Exxon does not dispute that it improperly paid revenues under the Act; and admits that its accounting system "is not properly weighing the cost-free and cost-burdened leases in the determination of the total royalty share for a particular well or unit." Exxon further concedes that as a result of its accounting error, "the cost percentage applicable to certain leases was calculated incorrectly and some of the royalty owners in the wells at issue in this lawsuit were underpaid." (See Affidavit of Richard C. Dykhuizen, Title Supervisor in Royalty Owner Relations for Exxon Company, U.S. A., a division of Exxon Corporation, October 28, 1996). Exxon represents that it is "in the process or correcting this mistake," and that it intends to make retroactive adjustments to all royalty payments that were affected by this error. (*Id.*)

Exxon seeks to avoid summary judgment on this claim on the ground that the "cost calculation examples attached to Ms. Heymans' affidavit are not sufficiently comprehensive for Exxon to determine the accuracy of Ms. Heymans' conclusion that an additional $77,017.37 in costs were deducted as a result of this accounting error." (Dykhuizen affidavit). Exxon further recites that "Ms. Heymans' calculations do not appear to be based on the schedule captioned 'Exxon Company, USA Calculation of Costs Deducted from Standard Royalty Owners Exxon Operated Sour Gas Wells NE Mayfield Field Beckham County, Oklahoma," attached as Exhibit 4 to the Plaintiff's Motion for Partial Summary Judgment.

■ Though attempting to discredit the underpayment calculations offered by the Plaintiff's accounting expert, Exxon offers no specific evidence demonstrating that the Plaintiffs' calculations are erroneous. Nor does Exxon offer any evidence as to what it contends the amount of the underpayment might be, or how the underpayment should be calculated. The amount of Exxon's royalty underpayments is, obviously, best determined from Exxon's own records. Exxon is clearly in a position to refute the opinions and calculations of the Plaintiff's expert with calculations or opinions of its own. Having failed to do so, Exxon may not avoid summary judgment based upon a bare, conclusional denial of the accuracy of the Plaintiff's evidence. A party resisting a motion for summary judgment must do more than make conclusional allegations, it must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.Pro. 56(e); *Dart Industries, Inc. v. Plunkett Co. of Oklahoma, Inc.,* 704 F.2d 496, 498 (10th Cir.1983); *Lake Hefner Open Space Alliance v. Dole,* 871 F.2d 943, 946 (10th Cir.1989). The Court finds that the Plaintiffs are entitled to summary judgment on this claim.

## V. *Plaintiffs' Constructive Fraud Claims*

The Plaintiffs' Seventh Cause of Action claims that Exxon "knowingly and willfully" violated the statutory reporting requirements of Title 52 Okla.Stat. § 570.12 (originally codified in 1980 as 52 Okla.Stat. § 540 C), by sending "false and misleading" royalty statements to the Plaintiff class members. In their Eighth Cause of Action, the Plaintiffs assert a claim for constructive fraud "for [Exxon's] gas transportation profits at the expense of the Plaintiffs." [11]

In its Brief in Support of Motion for Partial Summary Judgment, Exxon recited the various elements of a claim for actual fraud, such as a material misrepresentation, knowledge of falsity, and reliance, and argued that the Plaintiffs had failed to prove these essential elements. (See Exxon's Brief in Support of Motion for Summary Judgment, p. 15, *citing McDonald v. Humphries*, 810 P.2d 1262, 1267 (Okla.1990)). The Plaintiffs' allegations in their Fifth Amended Complaint that Exxon "failed to disclose" information it had a duty to disclose are best understood as claims for constructive, rather than actual, fraud. Any doubt in that regard was resolved in the Plaintiffs' briefs, which clearly characterize the Plaintiffs' fraud allegations as constructive fraud claims; accordingly, the Court will address them as such.

"Constructive fraud" is statutorily defined in Oklahoma as "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him." Title 15 Okla.Stat. (1991) § 59. Under Oklahoma law, a claim for constructive fraud requires a showing that the defendant owed some form of duty to the plaintiff, such as a fiduciary duty or a "duty based upon a confidential relationship or a special relationship of trust." [12] *Buford White Lumber Co. v. Octagon Properties, Ltd.*, 740 F.Supp. 1553 (W.D.Okla.1989). *See also Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350 (Okla.1988); *Faulkenberry v. Kansas City Southern Railway Co.*, 602 P.2d 203, 206 (Okla.1979). In contrast with actual fraud, constructive fraud does not require an intent to deceive. *Gentry v. American Motorist Ins. Co.*, 867 P.2d 468 (Okla.1994).

With regard to their Seventh Cause of Action the Plaintiffs argue, in essence, that Exxon's failure to include on its royalty statements the information required by Oklahoma's revenue reporting statute amounted to constructive fraud. Exxon does not deny that the royalty statements which it began distributing to the members of the Plaintiff class in May 1988 did not contain all of the information required by the revenue reporting statutes.[13] In fact, Exxon was not in compliance with the

11. The Plaintiffs characterize both their Seventh and Eighth Causes of Action as asserting claims for constructive fraud as well as claims for breach of fiduciary duty. The Court addresses the Plaintiffs' breach of fiduciary claims below.

12. In lieu of a fiduciary relationship, constructive fraud has also been recognized where one undertakes to speak and conveys only partial information to the other party. Under Oklahoma law, a duty to speak may arise from partial disclosure if, under the circumstances, partial disclosure is misleading. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud even though his

statement is true as far as it goes, since concealment is in effect a false representation that what is disclosed is the whole truth. *Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350 (Okla.1988).

13. Title 52 Okla.Stat. § 570.12, formerly § 540(C), requires that the following information be included with each payment made to an interest owner from the sale of oil or gas:

 4. Price per barrel or MCF, including British Thermal Unit adjustment of gas sold; ...

 8. Owner's share of the total value of sales attributed to such payment *prior to any deductions;* ....

(Emphasis added).

statutory reporting requirements until it modified its royalty accounting system in 1995.[14]

Exxon argues that the Plaintiffs' constructive fraud claim fails because the Plaintiffs have not met their burden of showing reliance upon the allegedly misleading royalty statements. The Plaintiffs do not identify, either in their briefs or in their Fifth Amended Complaint, any particular action they took or refrained from taking in reliance upon Exxon's royalty statements.[15] Instead, the Plaintiffs argue that "[r]eliance is not an element of constructive fraud," citing Title 15 Okla.Stat. § 59.

The Plaintiffs' argument ignores the plain language of Section 59, which clearly requires a showing of some form of prejudice or detrimental reliance ("... misleading another to his prejudice ..."). See Buford White Lumber Co. v. Octagon Properties, Ltd., 740 F.Supp. 1553, 1570 (W.D.Okla.1989) (constructive fraud claim failed because, inter alia, plaintiffs failed to show that they were misled to their detriment by defendant's nondisclosure of facts). See also Bunch v. K–Mart Corp., 898 P.2d 170, 172 (Okla.App.1995, cert.denied) (in a class action raising common-law fraud claim, Oklahoma Court of Ap-

peals noted that "a basic element of proof is reliance, which must be proven for each plaintiff)." [16] See also Marcus v. AT & T Corp., 938 F.Supp. 1158 (S.D.N.Y.1996). The Court notes that in this case, the Plaintiffs have made no attempt to prove, either individually or as a class, that they acted in reliance upon, or that they suffered some detriment from, Exxon's royalty statements. Though the Plaintiffs might conceivably demonstrate some detrimental reliance or prejudice they have suffered as a result of Exxon's royalty statements, they have failed to do so in this case, and thus have failed to raise a genuine issue of material fact for trial on their constructive fraud claims.

In lieu of carrying their burden of proof on their constructive fraud claims, the Plaintiffs seek to shift the burden of proof to Exxon, citing Harjo v. Collins, 146 Okla. 131, 293 P. 179 (1930). The Plaintiffs interpret Harjo as holding that where a claim of constructive fraud is asserted against a fiduciary, the fiduciary must overcome a presumption of constructive fraud. According to the Plaintiffs, not only must Exxon overcome a presumption that its royalty statements were fraudulent, Exxon must also "overcome the presumption that the relationship between it-

14. Instead of listing the owner's share of the total value of sales "prior to any deductions," Exxon reported to the interest owners a "cost-net" sales price, determined after "backing out" from the sales price certain costs incurred in treating, purifying and transporting the gas produced from the subject wells. Exxon reported to the owners the total value of the sales after "backing out" these costs. (See Deposition of Paul Matthew Kucera, June 14, 1996, pp. 120, 124, 125, 133; Deposition of Rodney Charles Galatas, June 14, 1996, pp. 69 – 70). This problem was not rectified until some time in 1995.

15. The Plaintiffs do allege, Fifth Amended Complaint that they "relied upon" Exxon's "misleading" royalty statements, "to their prejudice and damage."

16. In Bunch, supra, the plaintiffs brought a class action against a retailer for fraud. Noting that Oklahoma's class action statute is modeled on, but not identical to, the federal

class action rule, Rule 23, Fed.R.Civ.Pro., the Oklahoma Court of Appeals denied class certification. The court found that it was "not possible" for the class plaintiffs to show commonality of questions of fact in a suit for common law fraud "where a basic element of proof is reliance, which must be shown for each plaintiff." Id. But see Sparano v. Southland Corporation, 1996 WL 681273 (N.D.Ill. 1996) ("It is well established that individual issues of reliance do not thwart class actions of common law fraud claims,"), citing Arenson v. Whitehall Convalescent and Nursing Home Inc., 164 F.R.D. 659, 666 (N.D.Ill. 1996). The instant case had been certified as a class action before the Plaintiffs amended their complaint to add claims of constructive fraud; thus, the Court is not faced with the question of whether certification is appropriate. Further, since the Plaintiffs make no attempt to demonstrate reliance, the Court is not faced with the question of whether the class should be decertified in order to address individual issues of reliance.

self and Enco is void." (Plaintiffs' Brief in Support of Motion for Partial Summary Judgment, p. 18).

*Harjo* does not support the Plaintiffs' broad proposition. In *Harjo*, the Court alluded to the narrow, burden-shifting rule which has been addressed in a number of subsequent cases. Under this line of cases, where a plaintiff alleges fraud and undue influence, and proves both: a) inadequacy of consideration for a transaction, and b) a confidential relationship, the defendant occupying such a position of confidence "will be required to go forward and make a full and complete disclosure showing absolute good faith and that there was no fraud or undue influence practiced in a transaction between the parties." *Ellis v. Potter*, 455 P.2d 92 (Okla.App.1969), *quoting Montgomery v. Willbanks*, 198 Okla. 684, 181 P.2d 240 (1947) (Syllabus by the Court).

This Court's review of the cases reveals that the burden-shifting principle applied in *Harjo*[17] has been given a very limited application. First, this doctrine applies only where the plaintiff first proves the existence of a special confidential relationship; it is not routinely employed for a business trustee or one who occupies a fiduciary position in a business transaction. Only those relationships involving a high degree of confidence or trust will support a shifting burden of proof. *See, e.g. Blanchard v. Gordon*, 418 P.2d 678 (Okla.1966) (relation of brother and sister alone is insufficient to prove confidential character of relationship; there must be proof of substitution of will, lulling into sense of security, domination of brother by sister in business decisions, or other comparable elements); *Smith v. Smith*, 365 P.2d 142, 143 (Okla.1961) (relation of husband and wife alone insufficient to prove confidential relation; there must be proof of a substitution of the will, lulling into a sense of security, domination of grantor by defendant in business decisions, or other compa-

rable elements); *Ellis v. Potter*, 455 P.2d 92 (Okla.App.1969) (confidential relationship does not necessarily arise from relation of a parent and child; whether such a relationship existed was a question of fact); *Mahan v. Dunkleman*, 205 Okla. 54, 234 P.2d 366 (1951) (relationship of brother and sister not sufficient where there was no evidence of substitution of the will of the caretaking sister for that of the allegedly incapacitated brother).

Moreover, it appears that the *Mahan* burden-shifting approach has been used by the Oklahoma courts only where a conveyance of realty was challenged, generally on the ground that it was made without consideration or for inadequate consideration. *See Blanchard v. Gordon*, 418 P.2d 678 (Okla.1966) (suit to cancel a deed); *Ellis v. Potter*, 455 P.2d 92 (Okla.App.1969) (quiet title suit); *Smith v. Smith*, 365 P.2d 142 (Okla.1961) (suit to set aside conveyance of realty); *Montgomery v. Willbanks*, 198 Okla. 684, 181 P.2d 240 (1947) (suit to cancel deed); *Mahan v. Dunkleman*, 205 Okla. 54, 234 P.2d 366 (1951) (suit to cancel deed).

■ Although the Court concludes hereinafter that Exxon occupies a position of fiduciary in its relationship with the Plaintiffs, Exxon's relationship with the Plaintiffs is not the type of special, fiduciary relationship which has been held to support the application of the burden-shifting rule applied in *Harjo*. There is no evidence that Exxon substituted its will for that of the Plaintiffs; nor are the royalty statements of which the Plaintiffs complain the type of transactions which Oklahoma courts have scrutinized under the burden-shifting analysis. The Court concludes that the courts of Oklahoma would not apply the burden-shifting approach in this case, and thus declines to impose upon Exxon a ·presumption of constructive fraud.

■ In support of the constructive fraud claim asserted in their Eighth Cause

---

17. In *Harjo, supra,* the court found the defendant's evidence sufficient to overcome the presumption of fraud.

of Action, the Plaintiffs further assert that it is "undisputed" that "Exxon knew that it was making a huge (about 400%) profit on the gas transportation expenses it was assessing against the Plaintiffs' interest" and that Exxon "knew, or is deemed to have known, that it had a statutory duty to report these expenses under Oklahoma law and failed to do so." Presumably the Plaintiffs are referring to the statutory reporting requirements of Title 52 Okla. Stat. § 570.12. Section 570.12 requires that certain information be included with each payment made to an interest owner, including the owner's share of the total sales "prior to any deductions." Upon request by an owner, the operator is required to send "a specific listing of the amount and purpose of any . . . deductions."[18] The Plaintiffs do not allege or offer evidence that any of them made such a request. Thus, the Plaintiffs' contention that Exxon had a statutory duty to report transportation expenses is without merit. Further, as noted above, the Plaintiffs have failed to offer evidence that they relied to their detriment upon the royalty statements provided by Exxon.

In summary, the Court rejects the Plaintiffs' effort to shift the burden of proof to Exxon on the Plaintiffs' constructive fraud claims, and finds that the Plaintiffs have failed to offer evidence sufficient to raise a genuine issue of material fact as to their constructive fraud claims. Accordingly, Exxon is entitled to partial summary judgment with respect to the constructive fraud claims.

## VI. *Willfulness of Exxon's Reporting Violations*

The Plaintiffs seek partial summary judgment in the form of a finding that Exxon's violation of Oklahoma's revenue reporting statutes was willful.[19] As the Plaintiffs state, the statutory revenue reporting requirements at issue here have been in effect since 1980, and were in effect long before Exxon began paying royalties on the wells at issue in this case in 1988.[20] Exxon did not rectify the prob-

---

18. Section 570.12 provides in part: "The following information for each property and month of sale shall be included with each payment made to an interest owner from the sale of gas:
 1. Lease or well identification;
 2. Month and year of sales included in the payment;
 3. Total barrels or MCF attributed to such payment;
 4. Price per barrel or MCF, including British Thermal Unit adjustment of gas sold;
 5. Total amount attributed to such payment of severance and other production taxes, with the exception of windfall profit tax;
 6. Net value of total sales attributed to such payment after taxes are deducted;
 7. Owner's interest, expressed as a decimal, in production from the property;
 8. Owner's share of the total value of sales attributed to such payment prior to any deductions;
 9. Owner's share of the sales value attributed to such payment less owner's share of the production and severance taxes; and
 10. A specific listing of the amount and purpose of any other deductions from the proceeds attributed to such payment due to the owner *upon request by the owner.*" (Emphasis added).

19. Presumably the Plaintiffs seek a determination of willfulness in aid of their prayer for punitive damages.

20. The Plaintiffs make much of statements by Mr. Galatas and by Peggy Giammelle indicating that when Exxon finally changed its computer system, it did so primarily, or at least partially, because the system was antiquated. The Plaintiffs interpret this testimony as "as much as admitting" that Exxon would not have come into compliance with Oklahoma's royalty reporting requirements if it had not needed to update its computer system anyway. This is an unfair characterization of the testimony. Mr. Galatas, in particular, testified that: "Exxon's policy is to comply with all regulations. And to the extent that there are regulations we believe we're not in compliance with, it becomes a non-discretionary decision [to update the computer system]." Galatas deposition, p. 96. Further, Mr. Galatas testified: "It's been my experience in the practice of this company [Exxon] to comply with all policies and regulations in the areas we operate in. If there were regulations requiring us to report in a certain way, then in line with our policy, we had to change the system to report." Galatas deposition, p. 99.

lem until some time in 1995, long after the filing of this lawsuit.

■ Denying that its non-compliance was willful, Exxon places the blame on an antiquated, computerized accounting system. Exxon relies primarily upon the deposition testimony of its corporate representative, Rodney Charles Galatas. Mr. Galatas is in charge of Exxon's Owner Communications and Payables group, which group is responsible for preparing the checks and fielding inquiries from owners. Mr. Galatas testified that at the time Exxon implemented the change in its revenue reporting procedures, Exxon's computer system was approximately thirty years old, and that it was "difficult to find any systems analyst to support" the old system because it was so outdated. According to Mr. Galatas, the system had been "adjusted, enhanced, patched, [and] repaired over time," and that the system had become so outmoded that it "couldn't be patched any more." (Deposition of Rodney Charles Galatas, June 14, 1996, pp. 80–81). Mr. Galatas testified that if a modern computing system had been in place, it could have been enhanced to accommodate changes in reporting regulations. Moreover, Mr. Galatas appeared to concede that even with the old equipment, Exxon could have made modifications to allow the check runs to include at least a summary of the deductions, although such a change would have been "tough" to make, and would have taken weeks or months to accomplish. (Galatas deposition, pp. 84–86). Mr. Galatas further testified that it is the policy of Exxon to comply with all regulations, even if that means changing the computer system. (*Id*).

Ruling on the Plaintiffs' motion, the Court does not weigh their evidence against that offered by Exxon, or assess the credibility or plausibility of the explanations offered by Exxon's witnesses. When viewed in its most favorable light, Exxon's evidence raises a genuine factual dispute as to whether its non-compliance with the statutory reporting requirements was willful.[21]

## VII. *Plaintiffs' Breach of Fiduciary Claims*

The Plaintiffs assert claims for breach of fiduciary duty based upon Exxon's failure to make the required disclosures on their royalty statements (Seventh Cause of Action); and upon Exxon's deduction of allegedly excessive transportation costs (Eighth Cause of Action). Both sides seek summary judgment on these claims.

### A. *Existence of Fiduciary Relationship*

The Court first addresses the issue of whether a fiduciary relationship has been shown to exist between Exxon and the Plaintiffs. Exxon cites *Bunger v. Rogers*, 188 Okla. 620, 112 P.2d 361 (1941), in which the Oklahoma Supreme Court described a lessee/operator's obligation to pay royalties as "purely a contractual one and in no sense fiduciary." [22]

---

**21.** In its Order of June 3, 1994, the Court found that Exxon's violation of Oklahoma's revenue reporting statute by failing to reflect on the Plaintiffs' royalty statements the deduction of treatment costs did not amount to an independent tort for which punitive damages may be awarded. Since that time the parties have continued to conduct discovery, and the Plaintiffs have prevailed on their claim for an accounting. As a result of the accounting and continuing discovery, the Plaintiffs have now provided the Court with additional evidence, including evidence as to the amount and types of costs that Exxon has deducted from the Plaintiffs' royalties. Armed with this additional evidence, the Plaintiffs have raised tort claims of constructive fraud and breach of fiduciary duty. Such tort claims may, in an appropriate case, support a claim for punitive damages. The Court fully addresses these claims, as well as the Plaintiffs' prayer for punitive damages relating to these claims, in this Order. The new evidence does not, of course, alter the Court's legal conclusion that a violation of the state reporting statute, without more, does not amount to an independent tort for which punitive damages may be awarded.

**22.** In *Bunger, supra*, the Oklahoma court stated: "The defendants were merely lessees under an oil and gas mining lease and were under no obligation to the plaintiff, other than to pay the rent and royalty provided in said lease, and if they breached this duty then their liability was purely a contractual one and in no sense fiduciary."

In a line of cases following *Bunger,* however, the Supreme Court of Oklahoma has held—or at least stated in dicta—that a lessee/operator's relationship to its lessors is "similar to that of a trustee" or "in the nature of a fiduciary." *See Young v. West Edmond Hunton Lime Unit,* 275 P.2d 304 (Okla.1954) ("the unit organization with its operator stands in a position similar to that of a trustee for all who are interested in the oil production either as lessees or royalty owners"); [23] *Leck v. Continental Oil Co.,* 800 P.2d 224 (Okla.1989) (stating, in dicta, that a fiduciary relationship arises from a unitization order or operating agreement, and that a fiduciary duty is owed by the unit operator to royalty owners and lessees who are parties to the agreement or subject to the unitization order).

In several cases the United States Court of Appeals for the Tenth Circuit, applying Oklahoma law, has likewise recognized that the relationship between lessee/operator and lessor is fiduciary in nature. *See Reserve Oil, Inc. v. Dixon,* 711 F.2d 951 (10th Cir.1983) (*citing Young v. West Edmond* for the proposition that the operator of a unitized oil field stands in a position similar to that of a trustee with respect to those interested in the oil production; finding that a fiduciary duty was owed to non-operating owners by an operator under an operating agreement); *In Re: Mahan & Rowsey, Inc.,* 817 F.2d 682 (10th Cir.1987) (following *Reserve Oil, supra*); *Fransen v. Conoco, Inc.,* 64 F.3d 1481 (10th Cir.1995) (dicta), *cert. denied,* 516 U.S. 1166, 116 S.Ct. 1060, 134 L.Ed.2d 204 (1996).[24] *But see Quinlan v. Koch Oil Co.,* 25 F.3d 936, 942 (10th Cir.1994) (treating the issue of whether the relationship between an operator/lessee and a lessor is a fiduciary relationship under Oklahoma law as a question of fact); [25] and *Coosewoon v.*

---

**23.** It should be noted that one member of the Court strongly dissented from the Court's ruling in *Young, supra,* stating: "The majority opinion is further erroneous in that it declares defendant to be a trustee owing the highest fidelity to plaintiffs. Such a holding is squarely contrary to our previous holdings...." 275 P.2d at 316, *J. Williams dissenting, citing Bunger, supra.*

**24.** In *Fransen, supra,* the issue before the Court was whether an order of the Oklahoma Corporation Commission should be afforded collateral estoppel effect. In addressing this issue, the Tenth Circuit noted that under Oklahoma law, an oil or gas lessee owes its lessor certain duties, including a duty to further develop a lease after an initial well has been drilled and to protect the lease from drainage. 64 F.3d 1481, *citing Trust Co. v. Samedan Oil Corp.,* 192 F.2d 282, 284 (10th Cir.1951) (applying Oklahoma law); *and Samson Resources Co. v. Oklahoma Corporation Comm'n,* 702 P.2d 19, 23 (Okla.1985). The Court in *Fransen* described these duties as "inherent in the lessee's implied covenant to develop the lease as a prudent operator," and as "fiduciary in nature," *citing Leck v. Continental Oil Co.,* 800 P.2d 224, 228 (Okla. 1989).

**25.** In *Quinlan, supra,* the district court held as a matter of law that the defendant lessee had a fiduciary duty to notify the plaintiff royalty interest owner that the lessee was holding unclaimed funds belonging to the plaintiff in a suspense account. The district court granted partial summary judgment *sua sponte* as to the existence of a fiduciary relationship, in response to the defendant's motion to dismiss for failure to state a claim. Without citing *Young, Leck,* or *Reserve Oil,* the Tenth Circuit stated that under Oklahoma law, the existence of a fiduciary relationship is a question of fact which must be proven by the party asserting the relationship. *Quinlan,* 25 F.3d at 942. In support of this proposition the *Quinlan* court cited cases not involving the relationship between a lessor/operator and lessee. *See* 25 F.3d at 942, *citing Steinbrugge v. Haddock,* 281 F.2d 871, 872 (10th Cir.1960) (purchaser of oil and gas interests and vendor's agent); *Devery Implement Co. v. J.I. Case Co.,* 944 F.2d 724, 730 (10th Cir. 1991) (manufacturer/dealer and purchaser); *First National Bank & Trust Co. of Vinita v. Kissee,* 859 P.2d 502, 510–11 (Okla.1993) (bank and guarantor); *Mahan v. Dunkleman,* 205 Okla. 54, 234 P.2d 366, 370 (1951) (brother conveying realty to sister). *Quinlan* noted that district courts are vested with power to enter summary judgment *sua sponte,* but only where the losing party was on notice that he or she had to come forward with all of his or her evidence. 25 F.3d at 942, *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Because the district court had failed to notify Koch of its intention to grant summary judgment in Quinlan's favor on the issue of fiduciary duty, Koch was denied the opportunity to come forward with evidence creating a genuine factual dispute on the issue. Thus,

*Meridian Oil Co.*, 25 F.3d 920 (10th Cir. 1994) (allegation that operator had not made timely payments of royalties did not state claim for breach of fiduciary duty to market oil or gas at highest market price available).[26]

It is clear that the prevailing, if not unanimous, view in Oklahoma is that an operator occupies a fiduciary relationship or position of trust with respect to the lessors to whom royalties are paid. *See also* H. Williams & C. Meyers, Oil & Gas Law, Vol. 6, § 990.[27]

Exxon contends that the various Oklahoma state and federal courts have merely used the term "fiduciary" broadly in those cases describing the relationship between lessees and lessors, and that the "prudent operator" standard is the proper measure by which a lessee/operator's performance is to be judged. Exxon raises a valid point in that the Oklahoma courts have repeatedly applied what they term the "prudent operator" standard where an operator's conduct is challenged, even while recognizing that the relationship between the operator and the royalty interest owners is fiduciary in nature. *See, e.g. Samson Resources Co. v. Oklahoma Corporation Commission*, 702 P.2d 19, 23 (Okla. 1985). *See also Fransen v. Conoco, Inc.*, 64 F.3d 1481 (10th Cir.1995), *cert. denied*, 516 U.S. 1166, 116 S.Ct. 1060, 134 L.Ed.2d 204 (1996). In the leading Oklahoma cases, it appears that the courts have consistently used the "prudent operator" stan-

---

the Tenth Circuit held the district court erred in finding the relationship to be fiduciary as a matter of law. 25 F.3d at 942, 943. In this case, the Court is not faced with similar procedural concerns. Exxon has had ample opportunity to offer evidence in response to the Plaintiffs' motion for partial summary judgment.

26. In *Coosewoon, supra*, royalty interest owners sued for damages alleging the lessee had failed to make timely royalty payments under a mineral lease between defendant and plaintiffs' predecessors in interest. Among the plaintiffs' theories of recovery was a claim for breach of fiduciary duty. The district court granted summary judgment on this claim, and the Tenth Circuit affirmed, stating that "[u]nder Oklahoma law, an operator of an oil or gas lease owes a fiduciary duty to royalty owners to market oil or gas at the highest price available at the time of any production under the lease," but finding that in that case, the plaintiffs did not allege the defendant failed to market gas at the highest available market price. 25 F.3d at 930. The Court in *Coosewoon* did not hold that the relationship between the parties was anything other than a fiduciary relationship; and apparently did not consider the possibility that some other duty might have been owed by, or might have been breached by, the lessee in connection with the fiduciary relationship.

27. Williams and Meyers noted in their treatise that fiduciary principles "appear to be applicable to the relationship of the operator under a pooling, unitization or joint operating agreement, and persons having interests in the premises affected by such agreement." Williams & Meyers, Vol. 6, § 990, *citing Young v. West Edmond Hunton Lime Unit*, 275 P.2d 304 (Okla.1954), *Reserve Oil Inc. v. Dixon*, 711 F.2d 951 (10th Cir.1983) (operator of a unitized oil field stands in a position similar to that of a trustee with respect to those interested in the oil production; finding a fiduciary duty was owed non-operating owners by an operator under an operating agreement); *In Re: Mahan & Rowsey, Inc.*, 817 F.2d 682 (10th Cir.1987) (following *Reserve Oil, supra*); *Leck v. Continental Oil Co.*, 800 P.2d 224 (Okla.1989) (fiduciary relationship arises from unitization order or operating agreement, fiduciary duty is owed by unit operator to royalty owners and lessees who are parties to the agreement or subject to the unitization order). Another treatise, however, addressing the performance required to comply with the operator's implied duty of diligent and proper operation, remarked that: "[t]he lessee does not become a trustee for the lessor and their relation is not one in which special trust and confidence is placed in the lessee. Accordingly, the performance required of the lessee is not measured by a fiduciary standard." Kuntz, Oil and Gas, Vol. 5, § 59.3 (citations omitted). The latter treatise, however, cites no Oklahoma cases in support of this proposition, citing instead *Chapman v. Texas Co.*, 80 F.Supp. 15 (E.D.Ill. 1948) (applying Illinois law, holding lessee does not become trustee for lessors); and *Kirke v. Texas Co.*, 186 F.2d 643 (7th Cir. 1951) (under Illinois law, no relationship of special trust and confidence is created between lessor and lessee, and lease is subject to same rules of construction as any other contract).

dard to measure whether an operator has met its fiduciary obligation to its lessors. *See, e.g., Leck v. Continental Oil Co.,* 800 P.2d at 228, 229; *Samson,* 702 P.2d at 23.

 As Exxon suggests, the use of the term "prudent operator" implies that an operator's duty to its royalty interest owners is somewhat less imposing than the "highest level of trust" which is traditionally used to describe a trustee's duty. The application of the prudent operator standard has never been interpreted as precluding a lessor from maintaining a breach of fiduciary duty claim. The Court does not interpret the references to the lessee's duty to act as a "prudent operator" as inconsistent with the fiduciary nature of the relationship which is well established in Oklahoma law. Based upon the prevailing Oklahoma law and from the evidence before it, the Court concludes that Exxon, as operator, occupies a fiduciary relationship with respect to the Plaintiff royalty interest owners.

### B. *Exxon's Conduct*

The Plaintiffs claim that Exxon breached its fiduciary duty by deducting unreasonable and excessive gas transportation fees from the Plaintiffs' royalties, and by operating under an allegedly "self-dealing" contract for gas transportation with an affiliated gas transportation company. Exxon maintains that its gas transportation agreement with the affiliate is an arms-length agreement, and that the fees charged by the affiliate are reasonable.

### 1. *Relationship Between Exxon and Enco*

The Plaintiffs argue that Exxon's gas transportation fee arrangement with its subsidiary, Enco Gas Transportation Company, amounts to self-dealing. In that regard, the Plaintiffs challenge not only the parent/subsidiary relationship between Exxon and Enco, but also the manner and purpose for which Enco was formed.

---

**28.** In March 1985, Exxon entered into the original Gas Transportation Agreement with Metano Gas Gathering Company, a wholly-

An analysis of Exxon's relationship with Enco requires a discussion of the history of Exxon's formation of Enco. The original contract for the transportation of gas produced from the subject wells was formed in 1985 between Exxon and Metano Gas Gathering Company, a wholly-owned subsidiary of Leede Exploration, at a time when Exxon had a much smaller interest in the area.[28] Approximately three years later, Exxon purchased all of Leede's interests in the area, including the existing wells, the undeveloped units and the gas pipeline system. According to Exxon's evidence, Exxon capitalized Enco in order to enable Enco to own and operate the pipeline system. After ownership of the gas pipeline system had been transferred to Enco, Exxon and Enco amended the original Gas Transportation Agreement to reflect Enco's ownership of the pipeline.

The Plaintiffs offer a copy of an Exxon internal memorandum dated February 10, 1988, which stated in "question and answer" form that Enco would own the sour gas gathering pipeline system so that Exxon could carry third party gas for a fee. (See Exhibit 2 to Plaintiffs' Brief in Support of Motion for Partial Summary Judgment). According to Exxon's evidence, Enco was formed as a separate corporation to own the gathering and transportation system, because of the possibility that part of the system might be found to be subject to FERC regulations as a transmission line, and regulated as a "common carrier" by the Oklahoma Corporation Commission. (See Deposition of Cheryl L. Suter, July 3, 1996, p. 17; Deposition of Robert G. Parse, July 3, 1996, pp. 9–14, 53 – 54).

Exxon concedes that Enco has no employees of its own, and that Enco is operated by contractors and by persons who are actually employed by Exxon on a shared-services basis. (See Deposition of

owned subsidiary of Leede Exploration, formerly a defendant in this case.

Michael W. Walker, July 2, 1996, p. 111). According to Exxon, Enco pays its proportionate share of the salaries of all affiliated personnel who provide services to Enco. (Affidavit of Cheryl L. Suter, par. 8). Enco's earnings are consolidated with the Exxon Corporation tax return for purposes of reporting its earnings to the Internal Revenue Service. (See Deposition of Cheryl L. Suter, July 3, 1996, p. 35). Enco files its own state income tax returns and sales tax returns, and pays its own ad valorem and franchise taxes. (Affidavit of Cheryl L. Suter, pars. 6, 7). The Plaintiffs offer evidence that as of October 30, 1996, Enco had approximately $4.5 million in liquid capital in its bank account, and that Enco may soon pay a dividend to Exxon.

Relying on several of Exxon's internal memoranda, the Plaintiffs maintain that Exxon "determined" and controlled the transportation rates charged by Enco; that Exxon structured the arrangement so as to "guarantee" an "excellent" rate of return, and that Exxon's motive was to make "substantial additional profits" from

gas transmission charges at the expense of the royalty owners. (See Plaintiffs' Response to Exxon's Motion for Partial Summary Judgment, pp. 16 – 17; Exhibits D, E, F and K to Plaintiff's Response to Exxon's Request for Partial Summary Judgment).[29]

Both sides cite *Tara Petroleum Corp. v. Hughey*, 630 P.2d 1269 (Okla.1981)[30] in support of their respective positions with regard to Exxon's relationship with Enco. In *Tara*, a lessor under a mineral lease sued the lessee to establish the market value for gas sold under a royalty provision in the lease, asserting that the lessee and the gas purchaser were jointly owned by and subject to the common control of two individuals. The Court stated:

> Courts should take care not to allow lessors to be deprived or defrauded of their royalties by their lessees entering into illusory or collusive assignments or gas purchase contracts. Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors

---

**29.** The memoranda Plaintiffs rely on may be fairly summarized as follows:

(a) Memorandum captioned: "Northeast Mayfield Acquisition Accounting Issues as of February 10, 1988," which memorandum states, in pertinent part: "Why is the sour gas gathering line going to be owned by Enco? It will be a 100% Exxon line carrying third party gas for a fee."

(b) Memorandum captioned: "Status of Leede Acquisition Closing," and dated January 7, 1988. This memorandum states, in pertinent part: "Affiliates will know what rate they need to charge us after we agree what portion of the purchase price they will bear."

(c) Memorandum on Exxon letterhead from G.J. Sowyrda to Mr. D.L. Guttormson, dated January 18, 1988, stating: "While a lower basis is better for the Division through lower gathering fees that will be paid, a higher basis is more advantageous for Exxon Corporation, both through tax benefits and in higher rates that can be charged to other producers."

(d) Memorandum captioned: "N.E. Mayfield Gas Gathering Agreements," which memo states: "Existing agreement yields in

excess of 15% ROI to Enco," and "Fee structure could be renegotiable on a yearly basis to ensure Enco a reasonable (15%) return on investment."

**30.** In *Tara*, the Oklahoma Supreme Court held that where a lease calls for royalties to be paid based on the "market price at the well," and the operator enters into an arm's length, good faith gas purchase contract with the best price and term available to the producer at the time, such price is the "market price" and payment of royalties based on that price will discharge the operator's royalty obligation. In so holding, the court reasoned that if the gas purchase contract had not been reasonable when entered into, i.e., at a minimum fair and representative of other contracts negotiated at the time in the field, then the lessee has not discharged his duty to market gas. 630 P.2d at 1273, 1274. The burden of proving that the gas purchase contract was unfair or unreasonable at the time it was entered is upon the lessors seeking additional royalties. 630 P.2d at 1274. Because the lessors in *Tara* had not met their burden, the trial court's judgment in their favor was reversed.

are entitled to their royalty share of the higher price. *The key is common control of the two entities.*

630 P.2d at 1275 (emphasis added).

On the issue of common control, the *Tara* court noted that in order for a court to disregard the separate legal existence of two corporate entities, it must appear either: (1) that the separate corporate existence is a design or scheme to perpetrate fraud, or (2) that one corporation is so organized and controlled and its affairs so conducted that it is merely an instrumentality or adjunct of the other. 630 P.2d at 1275, citing *Gulf Oil Corp. v. State,* 360 P.2d 933, 936 (Okla.1961); *Wallace v. Tulsa Yellow Cab Taxi & Baggage Co.,* 178 Okla. 15, 18, 61 P.2d 645, 648 (1936). If such common control is present, then the contract between the two related entities may be found to be illusory or collusive. *Tara, supra.*

Though the Court's holding in *Tara* is addressed to a lessee's obligation to obtain the highest available market price for gas, rather than a lessee's right to deduct the cost of transporting gas to market, it is analogous. A reasonable factfinder could infer from the Plaintiffs' evidence that Enco is so organized and controlled and its affairs so conducted that it is merely an instrumentality or adjunct of Exxon, and thus conclude that the gas transportation rate structure amounts to overreaching by Exxon. The relationship between Exxon and Enco clearly bears upon the question of whether Exxon has acted as a prudent operator in its dealings with Enco.

2. *Reasonableness of Transportation Fees*

In support of their claim that Enco's transportation fees are unreasonable, the

Plaintiffs offer the Affidavit of Douglas L. Burton, which avers that the transportation rate is "many times the actual cost of moving the gas" from the tailgate of the treatment plant to the various points of delivery at the pipeline. (Affidavit of Douglas L. Burton, October 22, 1996, p. 2). Mr. Burton had previously testified on deposition that the transportation rate was "probably a high fee for that purpose," and that it was "a fairly large multiple of cost." (Deposition of Douglas L. Burton, August 12, 1996, p. 160). Exxon offers no evidence to dispute Mr. Burton's testimony, but points out that the Plaintiffs have not offered as evidence any computations comparing the actual cost of transportation to Enco's charges.

Exxon contends that Enco's transportation fees are based on the same rate structure Exxon contracted to pay to an unaffiliated pipeline company years ago. Exxon's evidence shows that the rates now charged by Enco are the same rates which were established in the original Gas Transportation Agreement between Metano Gas Gathering Company and Exxon dated March 11, 1985; specifically, $0.07 per MMBtu for the first mile, or fraction thereof, and $0.02 per MMBtu for each mile thereafter, or fraction thereof, measured from the tailgate of the plant to various points of delivery to third-party purchasers. (See Affidavit of Michael W. Walker, September 26, 1996).[31]

Exxon offers evidence that the original—and still current—rate structure was based upon non-mandatory guidelines which had been published by the Federal Energy Regulatory Commission ("FERC").[32] According to Exxon, although the parties to the Metano contract

---

31. Metano Gas Gathering Company is a subsidiary of Leede Exploration, a corporation which Exxon neither owns nor controls.

32. FERC regulations specified an allowance of seven cents ($0.07) per MMBtu for the first mile or fraction thereof plus two cents ($0.02) per MMBtu for each additional mile or fraction thereof, not to exceed twenty miles or a maximum allowance of forty five cents per MMBtu. See 18 C.F.R. § 271.1104(d). In its Brief in Support of Motion for Summary

Judgment, Exxon quotes from *Texas Eastern Transmission Corp. v. Federal Energy Regulatory Commission,* 769 F.2d 1053 (5th Cir. 1985), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1967, 90 L.Ed.2d 652 (1986), in which a group of producers challenged the FERC transportation rate regulations. The Fifth Circuit held that the FERC established rate of $0.07 per MMBtu for the first mile and $0.02 thereafter was not arbitrary or unreasonable, and that the FERC's choice of cutoff lengths

did not regard these guidelines as mandatory, the guidelines were considered to be an appropriate basis for the contractual rate because the FERC had based them upon the usual and customary rates for new systems. (See Affidavit of Randal Kirk, Letter from Randal Kirk to Patricia Horn dated May 29, 1996).[33]

Further, Exxon offers evidence that the rate in question is Enco's current "standard" rate, which Enco charges to other producers as well as Exxon. Exxon's evidence indicates that in addition to the Gas Transportation Agreement at issue in this case, Enco has more than one hundred other gas transportation agreements with the same mileage-based rate structure, including some agreements with other producers not affiliated with Exxon or Enco.[34]

The Plaintiffs maintain that at the time Exxon negotiated the original Gas Transportation Agreement with Metano, Exxon was not on equal footing with Metano. The Plaintiffs surmise that when the original Agreement was made, and the rates established, Exxon had two choices; either: (a) accept the fee proposed by Metano, or (b) build its own pipeline system. Since Exxon owned only a comparatively small interest in the field at that time, the latter option would have been economically unfeasible. The Plaintiffs argue, in essence, that because of the parties' allegedly unequal bargaining positions, the rate structure under that Agreement is not a reliable benchmark for the reasonableness of the same rate as it applies to the current Agreement.

Moreover, the Plaintiffs contend that the original Gas Transportation Agreement did not cover any gas which was being sold to El Paso Natural Gas Company.[35] This

---

was reasonable and amply supported by the record.

33. Mr. Kirk's letter, authenticated by his Affidavit, reads in part as follows:

"The transportation agreement is in the standard form which was utilized by Metano Gas, Inc. for Northeast Mayfield Field. The agreement is certainly an 'arms-length' agreement and it is the same agreement executed by other producers who owned interests in these wells and we have no record or recollection of any negotiations beyond tender of the agreement, and its execution and return after a reasonable time period. The transportation charges specified in Section 6 of the Gas Transportation Agreement were based upon guidelines which had been published by the Federal Energy Regulatory Commission ("FERC"). In regulations promulgated by the FERC pursuant to Section 110 of the Natural Gas Policy Act of 1978, the Commission established generic allowances for gathering and transportation (Regulation § 271.1104(d)). With respect to "new" delivery systems, defined as those for which construction commenced after November 9, 1978, the FERC specified an allowance of seven (7) cents/MMBtu for the first mile or fraction thereof plus two (2) cents for each additional mile or fraction thereof, not to exceed twenty (20) miles or a maximum allowance of forty-five (45) cents/MMBtu. These guidelines had no mandatory effect in regard to Metano's specification of transportation charges but were viewed as an appropriate basis for charges in that the FERC had researched usual and customary rates for new systems and had identified these guidelines as an acceptable standard."

34. According to Michael W. Walker, business development negotiator for Enco Gas Gathering Company, Enco has continued to enter into gas transportation agreements with other producers that provide for the same mileage-based transportation fee, including a gas transportation agreement with Kerr–McGee Corporation dated August 1, 1996. Some of these agreements are month-to-month and do not provide for an extended term. (Affidavit of Michael W. Walker, September 26, 1996).

35. The Plaintiffs also assert that none of the wells at issue in this case were subject to that original Agreement. In fact, several of the wells had not yet been drilled, and Exxon had not yet acquired interests in the others at the time the original Gas Transportation Agreement was executed. (See Deposition of Randal Kirk, pp. 44–48). However, the Agreement expressly contemplated that other wells would or could be added and made subject to its terms. (See Paragraph 4(a), Gas Transportation Agreement dated March 11, 1985). The Agreement has been amended several times as new wells have been drilled and interests in existing wells acquired. The most recent amendment includes all of the subject wells.

is significant, according to the Plaintiffs, because: (a) most of the gas being produced from the well at that time was being sold to El Paso, and (b) El Paso's main transmission line was located only about one thousand feet from the tailgate of the Metano treatment plant.[36] Since the Agreement has been amended to include the gas being sold to El Paso, the Plaintiffs are being charged at the maximum rate, $0.07 per MMBtu, for moving a larger volume of gas a relatively short distance.

There is also some dispute between the parties as to whether the original rate structure included or "built in" the cost of moving gas from the wellhead to the treatment plant ("gathering charges"), as well as fees for moving the gas from the tailgate of the treatment plant to the point of sale ("transportation charges"). *See TXO v. Commissioners of the Land Office*, 903 P.2d 259 (Okla.1994) (although the cost of transporting gas to a distant market remains deductible, gathering costs could not be deducted from royalty payments where such costs were necessary to get the product into the pipeline).[37]

Citing 18 C.F.R. § 284.7(c), the Plaintiffs contend that any rate structure for the movement of gas should take into consideration both the anticipated volume of gas to be moved through the system and the estimated cost of operating the system. The Plaintiffs argue that the volume and cost factors are particularly important here because of the large quantity of gas which is now being moved through the pipelines, as compared with the amount being moved in 1985 when the original rate was established. According to the Plaintiffs the "exceptionally large" volume of gas currently being transported "dramatically reduces" the actual cost of transportation per MMBtu.

### C. Merits of the Plaintiffs' Breach of Fiduciary Duty Claim

■ In summary, the Plaintiffs' evidence tends to prove that Enco's transportation fees, which Exxon deducted from the Plaintiffs' royalties, were excessive under the circumstances. It is undisputed that said transportation fees were in turn paid to Exxon's wholly owned subsidiary; and that Exxon has received or expects to receive dividends from the subsidiary. Meanwhile, Exxon failed to comply with the state's statutory revenue reporting requirements, which would have required Exxon to divulge at least the gross amount of sales attributable to each royalty owner prior to deductions. At the same time, Exxon failed to disclose to the royalty

36. The Plaintiffs cite the Declaration of Denton Edwards, dated May 12, 1995, and the Deposition of Michael W. Walker, July 2, 1996, p. 87, in support of this assertion. See Exhibits 3 and 4, respectively, to Plaintiffs' Brief in Support of Motion for Partial Summary Judgment.

37. The Plaintiffs base their contention on remarks made by Randal Kirk in his deposition, and on statements made in the affidavit of Douglas L. Burton. Mr. Kirk, who has held the position of General Counsel for Leede Exploration since before the original Gas Transportation Agreement was executed, initially testified that as he understood the Agreement, "transportation" and "gathering" were synonymous. (Deposition of Randal Kirk, October 24, 1996, p. 20). He further testified that he understood that the transportation fees paid on the Green and McCall wells were for "moving the gas from the wellheads ... to the [Metano gas] plant." (Kirk Deposition, pp. 52 — 53). However, after reviewing the fee provision of the Gas Transportation Agreement Mr. Kirk testified, in the same deposition, that for "sour" gas requiring treatment, the contractual rate is calculated from the tailgate of the plant to the purchaser's pipeline. (Deposition of Randal Kirk, pp. 81–90). Mr. Burton's Affidavit states that "a large portion of the expense of moving the gas produced from the subject wells is attributable to 'gas gathering,' i.e., moving the gas from the various wellheads to the subject gas treating facility," and that "the gas transportation rate which is being assessed to the royalty interest owners by Exxon includes not only the cost of moving the gas from the tailgate of the plant to the various points of delivery (transportation), but also the legally prohibited cost of moving the gas from the five wellheads to the plant (gathering)...." (Affidavit of Douglas L. Burton, October 22, 1996). Mr. Burton offers no explanation or factual support for this conclusion.

owners that it was using large amounts of gas to operate the treatment plant.

Exxon, as noted above, refutes many of the Plaintiffs' contentions, particularly the Plaintiffs' claim that the transportation rate was unreasonably excessive. In view of the conflicting evidence, the Court finds that reasonable factfinders could differ as to whether Exxon failed to act as a prudent operator in regard to its transportation fee arrangement, and in regard to its failure to comply with the statutory reporting requirements. The Court concludes that neither party is entitled to summary judgment on the Plaintiffs' breach of fiduciary duty claims.

## VIII. Plaintiffs' Request for Judgment Barring Exxon from Receiving Profit on Transportation Costs

In connection with their breach of fiduciary duty claims, the Plaintiffs request "a declaratory ruling that the Plaintiffs ... [with 'market value' leases] ... cannot be charged more than the actual cost of moving the gas from the tailgate of the subject gas treating facility to the various points of sale until the subject leases expire." (Plaintiffs' Brief in Support of Motion for Partial Summary Judgment, p. 3).

The Plaintiffs' evidence indicates that Enco is realizing a substantial profit on the gas transportation fees, and that Enco has paid or is considering a payment of dividends to Exxon. The Plaintiffs claim, in essence, that Exxon is indirectly profiting from the transportation charges.

The Plaintiffs cite passages from *Johnson v. Jernigan,* 475 P.2d 396 (Okla.1970), in which the Court states: "in the present case we are not concerned with the costs of care and preparation of the gas before delivery, but transportation *costs* away from the lease property" 475 P.2d at 400 (emphasis added); and "when the lessee has made the gas available for market ... any further *expenses* beyond the lease property must be borne proportionately by the lessor and lessee." 475 P.2d at 399 (emphasis added). The Plaintiffs argue that it is "inconceivable" that *Johnson v. Jernigan* would permit a lessee to charge

as "costs" a fee which is "approximately four times the reasonable expense of moving the gas under a collusive contract between the operator and its wholly owned subsidiary." (Plaintiffs' Brief in Support of Motion for Partial Summary Judgment, p. 15). *Johnson v. Jernigan, supra,* did not involve the payment of transportation fees to an entity affiliated with the lessee/operator, and the *Johnson* court did not address the question of whether such an entity is barred from making a profit. Thus, that court's use of the words "costs" and "expenses" cannot be interpreted as barring an affiliated transportation company from making a reasonable "profit" or return on its investment.

In *Young v. West Edmond Hunton Lime Unit,* 275 P.2d 304 (Okla.1954), the Oklahoma Supreme Court addressed an operator's obligations with regard to its purchase of minerals from the unit. The Court quoted *Magruder v. Drury,* 235 U.S. 106, 120, 35 S.Ct. 77, 82, 59 L.Ed. 151, 156 (1914) for the principle that a trustee can make no profit out of his trust. This comment in *Young,* however, has not been interpreted as barring an operator from making a profit from unit operations. In fact, it is normally expected that the lessee will operate the well for the *mutual profit* of itself and the royalty owners. *See, e.g., Teel v. Public Service Company of Oklahoma,* 767 P.2d 391 (Okla.1985); *Mitchell v. Amerada Hess Corp.,* 638 P.2d 441 (Okla.1981); *Spiller v. Massey & Moore,* 406 P.2d 467 (Okla.1965).

In the absence of any Oklahoma authority directly supporting the proposition the Plaintiffs espouse, the Court declines to enter a declaratory judgment which would bar Exxon and its subsidiary from making a profit, or a reasonable return on their investment, with regard to transportation fees. Rather, it appears that the question of whether a profit or return on investment is appropriate is guided by the standard of conduct to which operators are held, i.e., that of a prudent operator. *See, e.g., Feely v. Davis,* 784 P.2d 1066, 1069

(Okla.1989); *Samson Resources Co. v. Oklahoma Corporation Commission,* 702 P.2d 19, 23 (Okla.1985); *Fransen v. Conoco, Inc.,* 64 F.3d 1481 (10th Cir.1995), cert. denied, 516 U.S. 1166, 116 S.Ct. 1060, 134 L.Ed.2d 204 (1996). Whether any profit Exxon receives under its transportation fee arrangement with Enco violates its duty to act as a prudent operator is a question the jury will address in connection with the Plaintiffs' breach of fiduciary duty claim. The Court denies the Plaintiffs' motion for partial summary judgment insofar as it seeks a declaratory judgment on this issue.

## IX. *Claims Relating to "Purification Charges"*

In Count II of its Counterclaim, Exxon seeks a judgment declaring that it has the right to offset or recover certain fees referred to as "purification charges" from the Plaintiffs' royalties.[38] The Plaintiffs move for partial summary judgment on this counterclaim, as well as judgment in their favor for the amount of the purification charges which have heretofore been deducted, and a declaratory ruling prohibiting Exxon from deducting such charges in the future.

Exxon offers an affidavit from LuAnn York, identified as a senior accounting specialist in the Controllers' Department of Exxon. Ms. York avers that she has reviewed Cynthia Heymans' affidavit, and the schedule attached to the Plaintiffs' Motion for Partial Summary Judgment as Exhibit "4". According to Ms. York, the costs identified on that schedule under the column heading "EPNG PURIFICATION" were part of the transportation fees assessed by El Paso for gas shipped on its interstate pipeline system. (Affidavit of LuAnn York, October 28, 1996, pp. 1–2). Ms. York avers that although referred to on Exxon's accounting schedules as "purification fees," these charges were unrelated to the treatment of gas at the Metano Gas Plant. (York Affidavit, p. 2). Instead, Ms. York avers, these fees were "assessed by El Paso for shipment of gas delivered into its system, including gas that had already been treated in the Plant." (*Id.*)[39]

Exxon explains in its Brief in Response to the Plaintiffs' Motion for Partial Summary Judgment that "[u]nder tariffs in effect prior to April 1991, El Paso assessed a purification charge for all gas that was shipped on its interstate pipeline system." Exxon states that El Paso's policy of assessing purification fees was challenged before the Federal Energy Regulatory Commission ("FERC"), and that the FERC rejected the purification charge. According to Exxon, the FERC directed El Paso to modify its tariffs so that shippers were not automatically assessed purification fees. (Exxon's Brief in Response to Plaintiffs' Motion for Partial Summary Judgment, p. 18). The FERC did not, however, order El Paso to refund purification charges imposed on gas transported prior to that time.[40]

38. As to the amount of the purification charges, the Plaintiffs offer the affidavit of Cynthia Heymans, who states that Exxon deducted $37,786.28 as purification fees for the period May 1988 through December 1995; Exxon does not dispute the amount. Both sides also agree that in addition to that amount already deducted, El Paso has assessed some $63,000.00 in purification fees which have not yet been deducted from the Plaintiffs' royalties. Exxon's counterclaim seeks a determination that it has the right to recover or offset the $63,000.00 "unbooked" amount against the Plaintiffs' future royalties; and the Plaintiffs, in turn, seek to recover the $37,786.28 already deducted.

39. The Plaintiffs point out that Ms. York's affidavit denies only that these "purification" charges were for the treatment of gas *at the Metano Gas Plant,* leaving the obvious possibility that these charges were incurred for the treatment or processing of gas at the wellhead or elsewhere.

40. Exxon does not provide the Court with the FERC's ruling or any other documentation of the FERC proceedings, citing only to the administrative docket numbers. The Plaintiffs do not, however, dispute Exxon's statements with regard to the FERC administrative proceeding.

In this Court's view it is the nature and purpose of the expense, rather than its source, which determines whether Oklahoma law would allow that expense to be charged against the lessors' royalties. Thus, if the "purification fees" at issue in this case represent any form of treatment expense incurred in order to get the product into the pipeline, then they are not chargeable against the lessors' royalties, but are to be borne by the lessee/operator as a part of its duty to "ma[ke] the gas available for market." *TXO v. Commissioners of the Land Office*, 903 P.2d 259, 263 n. 2 (Okla.1995) (post-production costs for gas compression, dehydration and gathering were not chargeable to lessee since these processes are necessary to deliver marketable product at the point of delivery in connection with implied covenant to market). If, however, the so-called purification fees are in effect an arbitrary surcharge assessed by the transportation company upon delivery into the pipeline without regard to whether any treatment is provided, then these fees are more appropriately treated as a cost of transportation, and may be deducted in pro rata share from the Plaintiffs' royalties. *See Johnson v. Jernigan*, 475 P.2d 396 (Okla. 1970) (post-production gas transportation costs may be deducted, in pro rata share, from royalties).

The Plaintiffs' contention that these charges are treatment or processing costs appears to be based solely upon their designation as "purification fees." Although the name suggests some form of post-production treatment cost, Exxon's evidence indicates that the fees may have been simply an arbitrary charge "automatically" added onto the cost of transportation. Neither side's evidence enables the Court to determine as a matter of law the nature of these fees; accordingly, the Court finds that there is a genuine issue of material fact which precludes summary judgment on Count I of Exxon's counterclaim for recovery of "purification charges."

## X. *Other Costs Addressed in Count I of Exxon's Counterclaim*

Count I of Exxon's Counterclaim alleges that Exxon "has the right under the subject leases to deduct [certain] treating, operating and maintenance costs" from the Plaintiffs' royalty payments, and seeks a declaratory judgment establishing its right to make such deductions. The Plaintiffs move for partial summary judgment against Exxon on this Count, citing the Court's Order of July 31, 1995, which held that those "market value" leases which have no specific provision for payment of treatment or processing costs are not subject to such costs.

Although Exxon expresses its continuing disagreement with the Court's ruling, Exxon, in essence, acknowledges that this ruling is the law of the case. (See Exxon's Brief in Response to Plaintiffs' Motion for Partial Summary Judgment, pp. 16–17). Based upon Exxon's response, and upon the authorities cited in the Court's prior order, the Court finds that the Plaintiffs are entitled to partial summary judgment on Count I of Exxon's counterclaim.[41]

## XI. *Plaintiffs' Prayer for Twelve Percent Pre–Judgment Interest*

The Plaintiffs also seek partial summary judgment in the form of a finding that they are entitled to prejudgment interest at the rate of 12% per annum, compounded annually, on their claims for underpayment of royalties, under Title 52 Okla.Stat. § 570.10 (formerly Section 540). In response, Exxon cites the cases in which the Oklahoma courts have remarked that the 12% interest provision of that Section "is

---

41. Exxon disputes the amount of damages the Plaintiffs are entitled to recover for treating and processing cost deductions. According to Exxon's evidence, the total of $1,056,737.31 sought by the Plaintiffs for treating and processing costs from May 1988 through December 1995 includes treating costs for all gas accounted for by Exxon, including gas produced from the interests of other working interest owners, not just Exxon's gas. (See Affidavit of LuAnn M. York, October 28, 1996, par. 4).

**1274**

in the nature of a penalty." *See Fleet v. Sanguine, Ltd.*, 854 P.2d 892, 895, 899 (Okla.1993); *Hull v. Sun Refining & Marketing Co.*, 789 P.2d 1272 (Okla.1989); *McClain v. Ricks Exploration Co.*, 894 P.2d 422 (Okla.App.1994). Based on these cases, Exxon argues that a showing of wrongful intent or willfulness is necessary to invoke the twelve percent interest provisions.

Exxon's interpretation of the cases cited is too broad. In these cases, the Supreme Court of Oklahoma has not suggested that any wrongful intent or willfulness is necessary to invoke the twelve percent interest provision. It appears the Oklahoma court has described the twelve percent interest provision as "penal in nature" in the sense that its purpose is to coerce compliance with the state's Production Revenue Standards Act by making non-compliance unprofitable. In summary, *Fleet v. Sanguine, Ltd., supra*, held that the statutory twelve percent interest could not be added onto a judgment after a lessee/operator and lessor have made and accepted an offer of judgment for a lump sum settling the amount of unpaid royalties. *McClain v. Ricks, supra*, held that an operator is not liable for twelve percent interest on royalty payments which had been tendered but refused. In *Hull, supra*, the Court rejected the operator's claim that an executed division order was a condition precedent to the obligation to pay royalty payments. In the context of these cases, the use of the term "penal in nature" cannot be interpreted as limiting the applicability of the twelve percent interest provision to cases of intentional wrongdoing or willfulness.

Exxon next cites *Maxwell v. Samson Resources Co.*, 848 P.2d 1166 (Okla.1993) for the proposition that the twelve percent interest provision should be strictly construed because it is penal in nature. In *Maxwell, supra*, the Oklahoma Supreme Court held that a statute authorizing treble damages for failure to pay working interest revenues, Title 52 Okla.Stat. § 547, required a showing of some form of wrongful intent or conduct. The statute at issue in this case, which provides for the payment of prejudgment interest, is distinguishable from a provision for treble damages. *Maxwell* does not warrant such a strict construction of the statutory prejudgment interest provision at issue here.

Moreover, Exxon's suggestion that a showing of wrongful intent is required is not supported by the plain language of the statute. Under Title 52 Okla.Stat. § 570.10 D, if any portion of the proceeds from the sale of oil or gas production is not paid within the applicable time period, the unpaid portion "shall earn interest at the rate of twelve percent (12%) per annum to be compounded annually." [42] There is no mention in the statute of wrongful intent

---

**42.** Section 570.10 D reads as follows:

1. Except as otherwise provided in paragraph 2 of this subsection, where proceeds from the sale of oil or gas production or some portion of such proceeds are not paid prior to the end of the applicable time periods provided in this section, that portion not timely paid shall earn interest at the rate of twelve percent (12%) per annum to be compounded annually, calculated from the end of the month in which such production is sold until the day paid.

2.a. Where such proceeds are not paid because the title thereto is not marketable, such proceeds shall earn interest at the rate of six percent (6%) per annum to be compounded annually, calculated from the end of the month in which such production was sold until such time as the title to such interest becomes marketable. Marketability of title shall be determined in accordance with the then current title examination standards of the Oklahoma Bar Association.

b. Where marketability has remained uncured for a period of one hundred twenty (120) days from the date payment is due under this section, any person claiming to own the right to receive proceeds which have not been paid because of unmarketable title may require the holder of such proceeds to interplead the proceeds and all accrued interest into court for a determination of the persons legally entitled thereto. Upon payment into court the holder of such proceeds shall be relieved of any further liability for the proper payment of such proceeds and interest thereon.

52 Okla.Stat. § 570.10 D.

or willfulness, and the only exception to the twelve percent interest provision is where the proceeds are not paid because the title to the royalties is not marketable, in which case the unpaid royalties bear interest at the annual rate of six percent (6%).

 Though Exxon alludes to the provision for six percent interest where title is unmarketable, Exxon offers no evidence that any of the royalty payments at issue were withheld because of unmarketable title, or even that any of the Plaintiff class members had unmarketable title. Exxon does not even specify the nature of the title problem, or identify which royalty owners' titles were allegedly clouded. A mere suggestion that title is unmarketable is not enough to invoke the six percent interest provision. *See Quinlan v. Koch Oil Co.*, 25 F.3d 936 (10th Cir.1994); *Hull v. Sun Refining & Marketing Co.*, 789 P.2d 1272 (Okla.1989). The Court concludes, accordingly, that the six percent interest provision is not applicable.

 Exxon also contends that prejudgment interest cannot be recovered on an unliquidated, disputed claim, citing *Withrow v. Red Eagle Oil Co.*, 755 P.2d 622, 625 (Okla.1988); *RJB Gas Pipeline Co. v. Colorado Interstate Gas Co.*, 813 P.2d 1, 12 (Okla.App.1989); and *Smith v. Owens*, 397 P.2d 673 (Okla.1963). These cases involve claims for prejudgment interest under Title 23 Okla.Stat. § 6, and they clearly turn upon the language of that statute.[43] Title 52 Okla.Stat. § 570.10 D does not contain similar language. Exxon offers no authority for imposing a requirement that unpaid royalties be liquid, undisputed, or mathematically certain in order to bear prejudgment interest under Section 570.10 D, and the Court declines to engraft such limitations onto the statute.

Exxon correctly points out that the language "to be compounded annually" in Section 570.10 D, formerly Section 540 D, was added to the statute by an amendment which became effective July 1, 1989, and which was not retroactive. Thus, any prejudgment interest to which the Plaintiffs may be entitled under Section 570.10 D or its predecessor 540 D, would accrue as simple interest only, rather than compound interest, prior to the amendment's effective date of July 1, 1989. *Accord, Quinlan v. Koch Oil Co.*, 25 F.3d 936 (10th Cir. 1994). The Plaintiffs do not dispute this assertion.

Finally, Exxon argues that the Plaintiffs' claim for twelve percent interest is "inconsistent" with the Plaintiffs' renewed prayer for punitive damages. Exxon cites *Wagoner v. Bennett*, 814 P.2d 476 (Okla.1991), which held that double damages allowed under Oklahoma's Residential Landlord and Tenant Act for wrongful eviction are punitive in nature, and that a plaintiff tenant could not recover punitive damages in addition to these double damages.

In this case the merits of the Plaintiffs' claims for punitive damages are yet to be determined. Until such time as an award of punitive damages is made by the factfinder, the issue of whether such award, combined with an award of prejudgment interest, would amount to double recovery is not properly before the Court.

## XII. *Motion to Vacate Prior Order On Punitive Damages*

The Plaintiffs move the Court to vacate its June 3, 1994 Order granting partial summary judgment to Exxon with respect to the Plaintiffs' former "Fifth Cause of Action," which was a prayer for punitive damages. Among other findings the Court concluded that Exxon's failure to comply with Oklahoma's revenue reporting stat-

---

**43.** The text of Section 6 reads as follows:
Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.
23 Okla.Stat. § 6.

utes—without more—did not amount to an independent, willful tort for which punitive damages may be awarded.

 Now, after extensive discovery, and after prevailing on their claim for an accounting, the Plaintiffs offer the evidence outlined above in support of a wholly new claim for breach of fiduciary duty, raised in their Fifth Amended Complaint. Under Oklahoma law punitive damages are available for a breach of fiduciary duty where the gravamen of the claim sounds in tort. *See Quinlan v. Koch Oil Co.*, 25 F.3d 936 (10th Cir.1994). The breach of fiduciary duty claim now asserted by the Plaintiffs in this case is one which potentially warrants the imposition of punitive damages.

The Plaintiffs argue that the Court's order permitting them to file their Fifth Amended Complaint with a prayer for punitive damages is "inconsistent with" the Court's June 3, 1994 Order, and thus the June 3, 1994 Order should be vacated. The Plaintiffs anticipate that Exxon will argue that any punitive damage award is limited to that available under Oklahoma's revised punitive damage statute, which became effective for cases filed after August 25, 1995. The Plaintiffs' concern appears to be unwarranted. Exxon has not yet argued that the new statute is applicable; moreover the statute expressly limits its applicability to "civil actions filed after the effective date" of the Act. See Title 23, Okla.Stat. § 9.1 G. The instant action was filed prior to that date, and the Plaintiffs' punitive damages claim is clearly part of the original "action." The Court finds that the Plaintiffs have not shown adequate grounds for vacating the Court's June 3, 1994 Order.

## XIII. *Conclusion*

The Plaintiffs' Motion for Partial Summary Judgment is hereby GRANTED with respect to the Plaintiffs' Sixth Cause of Action for royalties on fuel consumed in the operation of the gas treatment plant; GRANTED with respect to Exxon's implementation of Senate Bill 168; GRANTED with respect to Count I of Exxon's counterclaim; and GRANTED insofar as it seeks a determination that any monetary judgment will be subject to statutory prejudgment interest at the rate of twelve percent. The Plaintiffs' Motion for Partial Summary Judgment is hereby DENIED in all other respects. Defendant Exxon Corporation's Motion for Partial Summary Judgment is hereby GRANTED with respect to the Plaintiffs' Third Cause of Action, in light of the Plaintiffs' acknowledgment that they are not entitled to damages on this claim. Exxon's Motion for Partial Summary Judgment is also GRANTED with respect to the Plaintiffs' claims for constructive fraud, and DENIED in all other respects. The Plaintiffs' Motion to Vacate Prior Order is hereby DENIED.